J. S67034/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALICIA DEE MCGRAW | : | |
| | : | |
| | : | No. 762 WDA 2014 |

Appeal from the Order Entered April 17, 2014
In the Court of Common Pleas of Greene County
Criminal Division No(s).: CP-30-CR-0000416-2012

BEFORE: DONOHUE, MUNDY, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                **FILED JANUARY 30, 2015**

The Commonwealth appeals from the order of the Greene County Court of Common Pleas granting the suppression motion of Appellee, Alicia Dee McGraw.[1]  The Commonwealth claims the trial court erred in concluding that it failed to demonstrate reasonable suspicion justifying the traffic stop of the vehicle Appellee was operating.  We affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] We note that this matter was captioned in the Court of Common Pleas as "Commonwealth v. Alicia Dawn McGraw."

The facts underlying this appeal are relatively straightforward.[2] On August 23, 2012, at 9:20 a.m., Pennsylvania State Trooper Brian Siege was in a marked patrol vehicle traveling east on State Route 21 in Franklin Township, Greene County, Pennsylvania. N.T., 9/24/13, at 5. He observed an Oldsmobile "quickly" pull out from a "Seven Eleven" onto State Route 21. *Id.* He saw a female operating the Oldsmobile and passengers inside. *Id.* The trooper followed the Oldsmobile through Morrisville and searched the Commonwealth Law Enforcement Assistance Network ("CLEAN") database for the vehicle's license plate number. *Id.* at 5, 7. The trooper received a report indicating the owner of the Oldsmobile was Crystal Wilson, a female, whose operating privilege was suspended for a driving under the influence (DUI) offense.[3] *Id.* at 5. The trooper activated his emergency lights and stopped the vehicle. *Id.*

The trooper made contact with the driver, later identified as Appellee. Appellee was not wearing a seat belt. *Id.* There were two other females in

---

[2] The trial court did not record its findings of fact when granting Appellee's suppression motion. *See* Pa.R.Crim.P. 581(I).

[3] Trooper Siege testified that he could obtain the registered owner's driving record when searching for a license plate. N.T. at 13. When he obtained the report in the instant matter, "it came back as Crystal Wilson on a 1992 Oldsmobile with the same license plate that I ran and then when the owner information came up, it came back to Crystal Wilson, same address and it said suspension, yes DUI related." *Id.*

the Oldsmobile. *Id.* at 6. Crystal Wilson was in the passenger seat.[4] *Id.* When the trooper informed them of the reason for the stop, Wilson identified herself as the owner of the vehicle. *Id.* at 6.

The trooper asked Appellee for her driver's license. *Id.* Appellee stated she did not have it with her. *Id.* The trooper asked for her name, date of birth, and if she had any other form of identification. *Id.* Appellee initially stated that her name was "Jacklyn Metcalf," her birth date was "January 21, 1981," and she did not have another type of identification. *Id.* When the trooper asked her how he could know if her information was correct, Appellee responded she would never lie to the police. *Id.*

The trooper searched the database with the information provided by Appellee, but was not able to find such an individual. *Id.* at 6-7. After attempting to clarify Appellee's information with her, she stated she was not being truthful and gave her real name and date of birth. *Id.* at 7. The trooper then obtained Appellee's driving record, which indicated her driving privilege was suspended for non-DUI offenses. *Id.* at 9. The trooper did not cite Appellee at the scene.

One month later, on October 12, 2012, the trooper filed a complaint charging Appellee with false identification to law enforcement authorities, driving while operating privilege is suspended or revoked, and restraint

_____

[4] The third female was not identified by the trooper. N.T. at 12.

systems for a seat belt violation.[5]  Appellee, on August 14, 2013, filed a motion to suppress, asserting the trooper "had no reason to stop [her]." Appellee's Omnibus Pre-Trial Mot., 8/14/13, at 1.  A suppression hearing was held on September 24, 2013, at which Trooper Siege testified.  On April 17, 2014, after consideration of briefs from the parties, the trial court entered an order granting Appellee's motion to suppress.  Order, 4/17/14, at 1.  The court concluded "the arresting officer did not have reasonable suspicion that the female driving the car was the occupant who was the suspended owner[,]" but did not enter findings of fact.  *Id.*; *see* Pa.R.Crim.P. 581(I).  The court further dismissed the charges against Appellee. *Id.*

The Commonwealth filed a timely notice of appeal and a certificate that the trial court's ruling effectively terminated its prosecution.  *See* Pa.R.A.P. 311(d), 904(e).  The Commonwealth complied with the court's Pa.R.A.P. 1925(b) order.  The trial court filed a responsive opinion holding that the reasonable suspicion to conduct the traffic stop did not exist under *Commonwealth v. Andersen*, 753 A.2d 1289 (Pa. Super. 2000).  Trial Ct. Op., 6/11/14, at 3-4.

The Commonwealth presently claims the trial court erred in suppressing all evidence obtained from the August 23, 2012 traffic stop.

---

[5] 18 Pa.C.S. § 4914(a); 75 Pa.C.S. §§ 1543(a), 4581(a)(2).

The Commonwealth contends Trooper Siege possessed reasonable suspicion to conduct an investigatory traffic stop to determine whether the registered owner, who was under suspension, was operating the vehicle. Commonwealth's Brief at 9-10. It argues the trooper possessed the following information relevant to his decision to stop the vehicle. First, the Oldsmobile "pulled out abruptly from a 7-11 gas station." *Id.* at 9. Second, the Oldsmobile was owned by a female with a "DUI suspended license." *Id.* Third, "the car was being driven by a female, **appearing to be around the same age as the owner of the vehicle**." *Id.* (emphasis added). According to the Commonwealth, these factors amounted to a specific and articulable basis to believe Appellee was driving under a suspended license under *Commonwealth v. Hilliar*, 943 A.2d 984 (Pa. Super. 2008), and *Commonwealth v. Farnan*, 55 A.3d 113 (Pa. Super. 2012). Commonwealth's Brief at 9-10. We conclude that the record does not support the Commonwealth's factual assertions and that the Commonwealth has not asserted a basis for appellate relief.

> When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. Where the defendant prevailed in the suppression court, we may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom

are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

***Commonwealth v. Cartagena***, 63 A.3d 294, 298 (Pa. Super. 2013) (*en banc*) (citation and punctuation omitted), *appeal denied*, 70 A.3d 808 (Pa. 2013). We may affirm "for reasons other than those relied upon by the trial court." ***Commonwealth v. Dales***, 820 A.2d 807, 813 n.2 (Pa. Super. 2003).

It is well settled that the Commonwealth bears the burden "of going forward with the evidence and of establishing that the challenged evidence was not obtained in violation of the defendant's rights." Pa.R.Crim.P. 581(H); ***accord Commonwealth v. Wallace***, 42 A.3d 1040, 1047-48 (Pa. 2012). The parties and trial court here agree the appropriate standard for justifying the underlying traffic stop was whether Trooper Siege had reasonable suspicion to believe he observed a violation of the Motor Vehicle Code. ***See*** 75 Pa.C.S. § 6308(b); Commonwealth's Brief at 7; Appellee's Brief at 13; Trial Ct. Op. at 3.

Reasonable suspicion is

a less stringent standard than probable cause necessary to effectuate a warrantless arrest, and depends on the information possessed by police and its degree of reliability in the totality of the circumstances. In order to justify the seizure, a police officer must be able to point to "specific and articulable facts" leading him to suspect criminal activity is afoot. In assessing the totality of the

circumstances, courts must also afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience and acknowledge that innocent facts, when considered collectively, may permit the investigative detention. Thus, under the present version of Section 6308(b), in order to establish reasonable suspicion, an officer must be able to point to specific and articulable facts which led him to reasonably suspect a violation of the Motor Vehicle Code[.]

"[W]hether an officer had reasonable suspicion that criminality was afoot so as to justify an investigatory detention is an objective one, which must be considered in light of the totality of the circumstances."

*Farnan*, 55 A.3d at 116 (citation and emphases omitted). The touchstone of a reasonable suspicion inquiry is whether "the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Commonwealth v. Holmes*, 14 A.3d 89, 96 (Pa. 2011) (citation and punctuation omitted).

This Court has previously considered the quantum of evidence necessary to stop a person for suspicion of driving while operating privilege are suspended or revoked in *Andersen*, *Hilliar*, and *Farnan*. A review of these cases is helpful.

In *Andersen*, this Court considered the following scenario:

At approximately 2:00 a.m. on April 7, 1999, Police Officers Steven Hillias and Earl Clark of the Perkasie Borough Police Department, along with other police officers, responded to a police call concerning a disturbance in the vicinity of a local tavern. Upon arriving at this location, the police officers encountered [the defendant] conversing with his girlfriend while he was

seated in a black Camaro. The police officers checked the records of the Camaro and learned that the automobile was registered to [the defendant]. Furthermore, the record check revealed that the driving privileges of both [the defendant] and his girlfriend were currently suspended.

As this encounter progressed, the police officers arrested [the defendant]'s girlfriend for disorderly conduct. Noting the suspension of [the defendant]'s driving privileges, the police officers advised [the defendant] not to drive his vehicle. [The defendant] informed the police officers that he would walk to the nearby residence of his friend and stay there for the night.

Later that day, at approximately 11:00 p.m., Officer Hillias observed [the defendant]'s automobile parked unattended in a different location than where [the defendant] had left it during the previous encounter. On April 8, 1999, at approximately 2:30 a.m., Officer Clark communicated to Officer Hillias via radio that he was following the "same ones from last night." Although Officer Hillias understood this reference to mean [the defendant] and [the defendant]'s girlfriend, Officer Clark had yet to identify either driver. Officer Hillias proceeded in his marked police car to Officer Clark's location.

Officer Clark had been following a black Camaro and a white Sable. Before the arrival of Officer Hillias, Officer Clark activated his emergency lights in an attempt to stop both vehicles. At [t]his point, Officer Clark had not observed who was driving the Camaro or the Sable. The Camaro pulled over and the Sable continued driving with Officer Clark in pursuit. The record indicates that Officer Clark observed [the defendant] as the driver of the Camaro as he passed [the defendant]'s automobile in pursuit of the Sable. However, the record provides no indication that Officer Clark communicated this observation to Officer Hillias. After stopping the Sable, Officer Clark determined the driver to be [the defendant]'s girlfriend.

When Officer Hillias arrived, he observed from a distance that Officer Clark's vehicle was stopped by the side of the road with its emergency lights in operation. In

addition, Officer Hillias saw a black Camaro bearing the same license plate as [the defendant]'s automobile. The Camaro was traveling at a slow rate of speed towards Officer Clark's position. Although Officer Hillias did not observe the driver of the Camaro, he activated the emergency lights of his police car and proceeded to stop the Camaro. Officer Hillias determined that [the defendant] was the driver of the Camaro and detected a strong odor of alcohol emanating from [the defendant]'s automobile. Officer Hillias administered several field sobriety tests upon [the defendant] who failed each one. During the course of the sobriety tests, Officer Hillias observed a bulge in [the defendant]'s sock that turned out to be a baggie containing 1.09 grams of marijuana. After [the defendant] was arrested he underwent a blood test that revealed a blood alcohol content of 0.16 percent.

*Andersen*, 753 A.2d at 1291-92. The defendant filed a motion to suppress, which was denied, and he was subsequently convicted for driving under the influence, possession of a small amount of marijuana, and driving while operating privilege was suspended. *Id.* at 1291.

The *Andersen* Court concluded the trial court erred in denying the defendant's suppression motion, reasoning

the knowledge a vehicle is owned by an individual whose driving privileges are suspended coupled with the **mere assumption** that the owner is driving the vehicle, does not give rise to articulable and reasonable grounds to suspect that a violation of the Vehicle Code is occurring every time this vehicle is operated during the owner's suspension. Therefore, based on the totality of the circumstances, we cannot find that Officers Clark and Hillias had articulable and reasonable grounds to suspect that a violation of the Vehicle Code had occurred.

*Id.* at 1294 (emphasis in original). We emphasized

the record reveals that Officer Clark did not actually determine the identity of the drivers until after both

- 9 -

vehicles had been pulled over.[ ]  Likewise, Officer Hillias did not actually know who was driving [the defendant]'s vehicle when he stopped it.  The Commonwealth further supports the legality of the traffic stops by pointing to the following additional information: 1) Officer Hillias observed that the Camaro he was following possessed the same license plate as [the defendant]'s vehicle; 2) the traffic stop occurred on the same street as the tavern near where the police encountered [the defendant] and his girlfriend the day before; 3) Officer Hillias observed [the defendant]'s vehicle traveling at a slow rate of speed towards Officer Clark's vehicle.

In reviewing the facts set forth by the Commonwealth, we note that neither Officer Clark nor Officer Hillias specifically observed [the defendant]'s vehicle violate the Vehicle Code prior to the traffic stops.  In addition, we fail to recognize the significance of the fact that [the defendant]'s vehicle was being driven near a location where the police previously had encountered [the defendant].  The only relevant information possessed by Officers Clark and Hillias prior to the traffic stops was that [the defendant]'s driving privileges were suspended and that the Camaro registered to [the defendant] was being operated.  Thus, both traffic stops were based on the **mere assumption** that [the defendant] was driving the black Camaro.

*Id.* at 1293 (emphasis in original).

In ***Hilliar***,

The arresting police officer's attention was called to the defendant's vehicle as he proceeded east on Market Street in West York Borough.  The police officer ran the defendant's license plate, and determined that the owner of the vehicle's license was under suspension.  The officer also discovered the owner's age and that he was a male. From his observation of the driver the officer believed that the defendant was male, and was about the same age as the owner.  Based on the officer's conclusion that it was likely that the person operating the vehicle was the owner because he was a male of the same age as the owner and had possession of the owner's vehicle, the police officer

- 10 -

decided to stop the vehicle for suspicion of driving on a suspended license.

*Hilliar*, 943 A.2d at 987-88. The defendant was convicted for DUI and driving while operating privilege was suspended. *Id.* at 988.

Although *Hilliar* ultimately considered whether the arresting officer complied with the Municipal Police Jurisdiction Act, 42 Pa.C.S. §§ 8951-8954, which governs an officer's law enforcement powers outside his primary jurisdiction, we noted

> [U]nder the facts of this case, the officer's suspicion that the driver of the vehicle was also the owner was a reasonable one because the driver matched the description of the owner as a middle aged man.[ ] Consequently, had the officer initiated a traffic stop while in his primary jurisdiction it would have been entirely legal.

*Id.* at 990. The *Hilliar* Court distinguished *Andersen* because, *inter alia*, the arresting officer in *Andersen* made no mention of an observation of the physical characteristics of the driver. *Id.* at 990 n.1.

In *Farnan*, this Court considered the following facts:

> On September 21, 2010, Sergeant David Mazza of the Sewickley Borough Police Department responded to a call received at approximately 4:40 p.m. The call involved a potential problem involving a custody dispute. K.L. ([the defendant]'s ex-wife) requested police assistance at her home on Bank Street. K.L. informed Sergeant Mazza that [the defendant] was on his way to pick up the couple's children, contrary to their custody order. She indicated to Sergeant Mazza that she thought that there was going to be a problem between she and [the defendant], which was why she called the police. Sergeant Mazza was familiar with both K.L. and [the defendant], having been involved in past incidents between the two.

Sergeant Mazza was one of three (3) officers in two (2) marked cars who arrived at the scene. At the time of his arrival, [the defendant] was not present at K.L.'s. While the officers were speaking with K.L., she pointed to a vehicle that was traveling along Bank Street and said "Here he comes." A vehicle approached K.L.'s house and then proceeded down the street without stopping. Sergeant Mazza was able to identify [the defendant] as the driver of the vehicle, as well.

Sergeant Mazza testified that, within thirty (30) days before this incident, K.L. had informed him that [the defendant] was driving with a suspended license. Upon receiving the information, Sergeant Mazza had confirmed that [the defendant's] license was suspended for a DUI-related matter. [The defendant] drove past K.L.'s house after looking at the officers and K.L. standing outside. Sergeant Mazza then got into his police car and followed [the defendant]. After approximately 20 seconds, Sergeant Mazza activated his lights and stopped [the defendant] Appellant. Sergeant Mazza testified that he pulled [the defendant] over for three (3) reasons: (1) the suspended license; (2) the suspicious behavior in driving past K.L.'s house due to the presence of police vehicles and personnel; and (3) the need to investigate K.L.'s complaint.

*Farnan*, 55 A.3d at 114-15 (some punctuation omitted).

*Farnan* principally considered the "freshness" of the arresting officer's knowledge that the defendant's license was suspended. *Id.* at 118. We concluded that "under the totality of circumstances . . . , the 30–day delay between the time Sergeant Mazza learned that [the defendant's] license was suspended and the date the officer conducted a traffic stop was not so lengthy that it rendered the officer's information stale." *Id.* We further determined "Sergeant Mazza articulated sufficient facts to support a

- 12 -

reasonable belief that Appellant was in violation of the Motor Vehicle Code at the time of the traffic stop." *Id.*

Reading ***Andersen***,[6] ***Hilliar***, and ***Farnan*** together, it is apparent that information that an owner of a vehicle had her license suspended alone cannot justify the stop of the vehicle. *See **Andersen***, 753 A.2d at 1294. Similarly, an observation that a vehicle "quickly pulled" into the roadway is of little relevance where there is no indication the maneuver constituted a reason to believe the vehicle was being operated contrary to the Vehicle Code. *See id.* Thus, to justify a stop to investigate whether an owner under suspension is operating the vehicle, the Commonwealth must adduce additional evidence to justify the belief that the driver is the owner whose license was suspended. *See id.*; ***Farnan***, 55 A.3d at 114-15, 118; ***Hilliar***, 943 A.2d at 990.

Instantly, the Commonwealth argues it established reasonable suspicion because the trial court found that Appellee was the same gender

---

[6] We note that the continued validity of ***Andersen*** has been questioned. *See **Hilliar***, 943 A.2d at 990 n.1. Specifically, the ***Hilliar*** Court observed ***Andersen*** was decided under the prior "articulable and reasonable grounds" standard, which was equated with "probable cause," but later abrogated by amendments to 75 Pa.C.S. § 6308(b) in favor of a "reasonable suspicion" standard. *Id.* Although the ***Andersen*** Court applied the "articulable and reasonable grounds" standard, it observed that the "reasonable basis necessary to justify a stop **is less stringent than probable cause** . . . ." ***Andersen***, 753 A.2d at 1293 (citation omitted and emphasis added). Accordingly, ***Andersen*** remains persuasive authority with respect to the issue raised in this appeal.

and appeared to be the same age as the owner of the vehicle. *See* Commonwealth's Brief at 9; Trial Ct. Op. at 3. If the record supported such a finding, *Hilliar* would control the instant matter.

Our review of the record reveals Trooper Siege, after seeing the Oldsmobile pull into the roadway in front of him, entered the vehicle's license plate information into his computer. N.T. at 5. The trooper, however, testified:

> The report came back that the owner of the registered vehicle was a female named Crystal Wilson and she was under a DUI related suspension. I noted at that time that there was a female operator driving the vehicle and there w[ere] also passengers inside the vehicle.
>
> *   *   *
>
> Driving on DUI related suspension is a serious traffic offense. Like I said, it came back for Crystal Wilson, you know, and there was a female driving the car at the time. I thought that would be the owner . . . would be the operator and wanted to verify that.

*Id.* at 5-6.

On cross-examination by Appellee's counsel, the trooper reiterated that "the license came back to a female that was under DUI related suspension[ and t]here was a female driving the car." *Id.* at 12. The trooper conceded that he was not familiar with any of the vehicles' occupants. *Id.* at 13. The Commonwealth did not present further evidence describing what additional identifying information the trooper obtained before stopping the Oldsmobile.

Thus, even reviewing the record in a light most favorable to the Commonwealth, we discern no record support for the trial court's and the Commonwealth's suggestion that Appellee appeared to be the same age as Crystal Wilson, the suspended vehicle owner, or that the trooper believed that to be the case. **See** Commonwealth's Brief at 9; Trial Ct. Op. at 3. The Commonwealth's instant argument thus rests upon a faulty premise, and **Hilliar**, where the stop based on observations that the defendant-driver matched the owner's description as "a middle aged man," does not control. Moreover, because there is no record evidence that the trooper was familiar with Appellee, the present matter is distinguishable from the stop based on an identification of the driver made by an officer familiar with the defendant-driver in **Farnan**.

We are mindful that the Commonwealth established Appellee and the owner of the vehicle were both female. However, the Commonwealth does not assert that this similarity alone was adequate to establish reasonable suspicion, nor did it do so before the trial court. **See** Commonwealth's Brief at 9-10; Commonwealth's Opp'n to Suppression of Evidence, 10/16/13, at 4. Therefore, we decline to address *sua sponte* whether a common gender was a sufficient, under the circumstances of the present case, to sustain a belief that Appellee was the registered owner subject to a license suspension. **See Commonwealth v. B.D.G.**, 959 A.2d 362, 371-72 (Pa. Super. 2008).

Order affirmed.

J. S67034/14

Judge Donohue joins the memorandum.

Judge Mundy notes dissent.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/30/2015