J-A14019-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| TAYLOR JEFFERSON, | : | |
| | : | |
| Appellant. | : | No. 1119 WDA 2018 |

Appeal from the Judgment of Sentence Entered, June 12, 2018,
in the Court of Common Pleas of Allegheny County,
Criminal Division at No(s):  CP-02-CR-0007306-2017.

BEFORE:  OTT, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY KUNSELMAN, J.:           **FILED AUGUST 02, 2019**

Taylor Jefferson appeals from the judgment of sentence imposed following his conviction of firearms not to be carried without a license.[1]  We vacate the judgment of sentence, reverse the order denying suppression, and remand for further proceedings consistent with this memorandum.

The trial court, in disposing of Jefferson's motion to suppress, set forth the following factual history:

> On April 25, 2017, around 11:00 p.m., Officers Alexandria Taylor and Nathan Detting with the Pittsburgh Bureau of Police were patrolling the Homewood area of Pittsburgh.  As part of their routine patrol, the officers ran license plate numbers of various vehicles through their computer system to check for stolen vehicles and any vehicle code violations.

---

[1] 18 Pa.C.S.A. § 6106(a)(1).

When the officers ran the license plate of a vehicle that was being driven by [Jefferson], the officers learned that there was a "full extradition warrant out of Pennsylvania" for an individual named Taylor Jefferson. The officers also learned that Taylor Jefferson was the registered owner of the vehicle. The [National Crime Information Center ("NCIC")] system that the officers used to run the license plate did not provide the officers with a picture of Mr. Jefferson, and the officers were not otherwise familiar with [him] or his name.

As the officers were attempting to validate the warrant, and before the officers had made any contact with [Jefferson's] vehicle, [Jefferson] pulled over to the side of the road and lawfully parked the vehicle. Officers Taylor and Detting pulled over behind [Jefferon's] vehicle and activated a spotlight. The officers' vehicle did not block [Jefferson] from being able to leave the parking space. The officers pulled over behind [Jefferson's] vehicle in order to identify the driver and to investigate whether he was the registered owner of the vehicle, and thus the person for whom there was an arrest warrant.

Officer Detting and Officer Taylor simultaneously approached the vehicle, with Officer Detting approaching the driver's side and Officer Taylor approaching the passenger side. [Jefferson] was about to exit the vehicle, with one foot already on the ground, when the officers approached the car. Officer Netting told [Jefferson] to remain in the vehicle and asked for his identification. [Jefferson] informed Officer Detting that he had left his ID at home, but he provided his full name to the officer.

As Officer Detting was speaking to [Jefferson], Officer Taylor observed [Jefferson] "slowly and deliberately reach into his right sweat pants pocket" with his right hand. She was able to notice this movement because the officers had illuminated the inside of the vehicle with a spotlight. Officer Taylor was about to tell [Jeferson] to remove his hand from his pocket when she saw him "start to pull his hand out of his pocket." As he pulled his hand out of his pocket, Officer Taylor saw that [Jefferson] had a "good grip" on a firearm. Upon seeing the firearm, Officer Taylor drew her weapon and yelled "gun, gun, gun." Officer Detting drew his weapon, and [Jefferson] promptly handed the firearm to Officer Detting. Officer Detting retrieved [Jefferson's] weapon and asked [Jefferson] to exit the vehicle. [Jefferson] was handcuffed, and the officers ultimately determined that [he] did not have a license

to carry a concealed firearm.  [Jefferson] was then taken into custody.

Trial Court Opinion, 2/8/18, at 1-3 (numbering and formatting omitted).

Jefferson was subsequently charged with one count each of firearms not to be carried without a license, persons not to possess firearms,[2] and of possession of a firearm with an altered manufacturer's number.[3]  After the preliminary hearing, the trial court dismissed the charge of possession of a firearm with an altered manufacturer's number, but held the remaining charges for trial.

Jefferson filed a motion to suppress the firearm.  Following a hearing, the trial court denied the motion.  The case proceeded to a non-jury trial.  The charge of persons not to possess firearms was *nolle prossed*, and the trial court convicted Jefferson of firearms not to be carried without a license.  On June 12, 2018, the trial court sentenced Jefferson to three and one-half to seven years of incarceration.  Jefferson filed a post-sentence motion to reconsider the sentence, which the trial court denied.  Jefferson filed a timely notice of appeal.  Both Jefferson and the trial court complied with Pa.R.A.P. 1925.

Jefferson raises one issue on appeal: "Whether the trial court erred in denying [his] motion to suppress because, although the trial court correctly concluded that the police officers subjected [him] to an investigative

---

[2] 18 Pa.C.S.A. 6105(a)(1).

[3] 18 Pa.C.S.A. 6110.2(a).

detention, the police officers did not possess reasonable suspicion to justify that seizure?" Jefferson's Brief at 4.

On appeal from the denial of a suppression motion,

Our standard of review . . . is whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. Our scope of review is limited; we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Galendez*, 27 A.3d 1042, 1045 (Pa. Super. 2011) (*en banc)* (citation omitted). Additionally, "appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pretrial motion to suppress." *Commonwealth v. Bush*, 166 3.Ad 1278, 1281-82 (Pa. Super 2017) (citation omitted).

Here, the parties do not dispute that the trial court correctly determined that Jefferson "was subjected to an investigatory detention at the time the officers approached his vehicle and instructed him to remain inside of the vehicle." Trial Court Opinion, 2/8/18, at 4. We discern no abuse of discretion in that ruling. *See Commonwealth v. Hicks*, 208 A.3d 916, 926–27 (Pa. 2019) (finding that "[f]or purposes of the Fourth Amendment, a person is seized when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave") (internal quotations and citations omitted). Accordingly, the sole question

presented for review is whether the officers had the requisite level of suspicion to justify the detention.

When reviewing the legality of a vehicle stop based upon suspected criminal activity, as herein occurred, we adhere to the following considerations:

> The United States Supreme Court in [**Terry v. Ohio**, 392 U.S. 1 . . . (1968),] and in **Adams v. Williams**, 407 U.S. 143 . . . (1972), has suggested that even in the absence of probable cause there may be, under certain circumstances, justification for a limited intrusion upon the privacy of an individual. Under these decisions the Court has suggested that a brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining additional information may in fact be reasonable although the officer at that time did not possess probable cause that would justify an arrest. In the **Terry**, **supra** and **Adams**, **supra** decisions, the Court was required to struggle with the balancing of the right of society and the right of an individual in street encounters. Because a motorist's extreme mobility may otherwise allow him to avoid police confrontation, the State has an equally strong interest in these cases in stopping a moving vehicle to freeze momentarily a situation of suspected criminality. However, these decisions have made it clear that to justify the intrusion the police officer must be able to point to specific and articulable facts which taken together with rational inferences from those facts reasonably warranted the intrusion. **See Adams v.** [**Williams** ], **supra**; **Terry v. Ohio**, **supra**. Thus, it is also clear that an investigative stop of a moving vehicle[,] to be valid[,] must be based upon objective facts creating a reasonable suspicion that the detained motorist is presently involved in criminal activity.

**Commonwealth v. Feczko**, 10 A.3d 1285, 1288 (Pa. Super. 2010) (*en banc*) (quoting **Commonwealth v. Murray**, 331 A.2d 414, 418 (Pa. 1975) (some brackets in original)).

In determining whether police had reasonable suspicion to initiate an investigative detention, "the fundamental inquiry is an objective one, namely, whether the facts available to police at the moment of the intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate." *Commonwealth v. Gray*, 784 A.2d 137, 142 (Pa. Super. 2001). Reasonable suspicion is dependent on both the quantity and quality of the information police possess prior to detaining an individual. *Alabama v. White*, 496 U.S. 325, 330, (1990); *see also Commonwealth v. Wiley*, 858 A.2d 1191, 1197 (Pa. Super. 2004) (holding that reasonable suspicion is measured by what the police knew prior to conducting a search or seizure). In order to assess the facts available to police, we must consider the totality of the circumstances. *Id*. While reasonable suspicion is a less stringent standard than probable cause, the detaining officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks and citation omitted).

Jefferson contends that the trial court erred in finding that the police had reasonable suspicion to justify the investigative detention. Jefferson's Brief at 13. Jefferson argues that when the officers stopped him, they had not observed any violation of the Vehicle Code, nor any suspicious behavior that suggested criminal activity was afoot. *Id*. Jefferson maintains that the police had no information to suggest that he was the registered owner of the vehicle, since they were not familiar with the owner, and the NCIC check did

not provide any photo or physical description of the owner. *Id*. Jefferson additionally argues that, at the time of the stop, the officers knew only that there *may* have been an outstanding arrest warrant for the owner, but had not confirmed the validity of the warrant. *Id*. Thus, Jefferson claims, because the police initiated the stop based solely upon the assumption, or unparticularized hunch, that the driver of the vehicle was the registered owner and that the arrest warrant for the owner was valid, they lacked reasonable suspicion to justify the stop. *Id*.

Jefferson relies on *Commonwealth v. Andersen*, 753 A.2d 1289 (Pa. Super. 2000), in support of his argument that the police lacked reasonable suspicion to stop him. In *Andersen*, police responded to a call regarding a domestic disturbance at a local tavern. Upon their arrival, they encountered the defendant seated in a black Camaro. Upon investigation, the officers discovered that it was registered to the defendant and that the defendant's driving license was suspended. The officers advised the defendant not to drive his vehicle, and permitted him to walk to a nearby friend's house. The next day, one of the officers noticed a black Camaro driving near the same tavern. The officer pulled up behind the Camaro and confirmed it bore the same license plate as the defendant's vehicle. Although the officer had not identified the defendant as the driver of the Camaro, he activated his lights and pulled the Camaro over. After approaching the vehicle, the officer determined that the driver was in fact the defendant. The officer smelled alcohol and found a small bag of marijuana. The officer arrested the defendant, and the trial court

subsequently convicted him of driving with a suspended license, driving under the influence, and possession of marijuana. *See Andersen,* 753 A.2d at 1291–92.

On review, the *Andersen* Court held that,

> the knowledge a vehicle is owned by an individual whose driving privileges are suspended coupled with the *mere assumption* that the owner is driving the vehicle, does not give rise to articulable and reasonable grounds to suspect that a violation of the Vehicle Code is occurring every time this vehicle is operated during the owner's suspension.

*Id*. at 1294 (emphasis in original). The *Andersen* Court noted that the police observed no violation of the Vehicle Code and failed to identify the driver as the defendant *before* initiating the traffic stop. *Id*. That the police were familiar with the defendant, that his "vehicle was being driven near a location where the police previously had encountered [him]," and that the license plate matched the defendant's vehicle were not enough to justify the investigative detention. *Id*. at 1293.

In so ruling, the *Andersen* Court reasoned that,

> [h]olding otherwise would subject drivers who lawfully operate vehicles owned or previously operated by a person with a suspended license to unnecessary traffic stops. The example of the family car demonstrates this point. Although a family car may be registered in the name of one individual, numerous additional drivers may be licensed and insured to operate the same vehicle. If we allow the police to stop any vehicle for the mere fact that it is owned or once operated by an individual whose operating privileges are suspended, then each additionally insured driver of the family car could be subject to traffic stops while lawfully operating the family car simply because the license of another operator of the vehicle is suspended. The lack of articulable and reasonable grounds to suspect a violation of the Vehicle Code

when such a stop occurs without knowing the identity of the driver is patent.

*Id*.

Notably, *Andersen* was decided under the prior version of 75 Pa.C.S.A. § 6308(b), which required officers to have "articulable and reasonable grounds" to justify a vehicle stop. *See Feczko*, 10 A.3d at 1287. The "articulable and reasonable grounds" standard has been interpreted to be synonymous with the more stringent standard of "probable cause." *See id*. at 1288. In 2004, the statute was amended to its current version, which requires reasonable suspicion for a traffic stop. *See* 75 Pa.C.S.A. § 6308(b). Because of this change, the continued validity of *Andersen* has been questioned. However, for the reasons set forth below we find that *Andersen* guides our analysis.

While *Andersen* was decided prior the 2004 amendment, the Court determined that "the reasonable basis [or articulable and reasonable grounds] necessary to justify a stop is less stringent than probable cause." *Andersen*, 753 A.2d at 1293. Thus, although other courts have equated "articulable and reasonable grounds" with "probable cause," the *Andersen* Court did not do so, and employed a level of scrutiny akin to reasonable suspicion. Accordingly, we conclude that *Andersen* provides persuasive authority in deciding whether the officers lawfully stopped Jefferson.

In addition, since the 2004 amendment, on at least three occasions this Court has addressed the question of what evidence is sufficient under section 6308(b) to establish that police had reasonable suspicion to justify a vehicle

- 9 -

stop under circumstances substantially similar to those presented in *Andersen*. First, in *Commonwealth v. Hilliar*, 943 A.2d 984 (Pa. Super 2008), a police officer ran the defendant's license plate and discovered that the registered owner of the vehicle had a suspended license. *Id*. at 987. The officer also obtained information regarding the owner's age and gender. *Id*. After the officer observed that the driver of the vehicle was of the same gender and was approximately the same age as the registered owner, he stopped the vehicle for suspicion of driving on a suspended license. The *Hilliar* Court held that "the officer's suspicion that the driver of the vehicle was the owner was a reasonable one because the driver matched the description of the owner as a middle aged man." *Id*. at 990 n.1. Notably, the *Hilliar* Court distinguished *Andersen* on the basis that, in *Andersen* "there [was] no mention of the police officer making any observation of the physical characteristics of the driver." *Id*.

Second, in *Commonwealth v. Bailey*, 947 A.2d 808 (Pa. Super. 2008), a police officer received a radio call regarding a black TransAm with an abnormally loud exhaust system. *Id*. at 810. The officer was also notified that the TransAm's owner likely had a suspended license. *Id*. Several hours later, the officer spotted a black TransAm with a loud exhaust system, and conducted a vehicle stop. *Id*. Relying upon *Andersen*, the *Bailey* Court observed that the officer's "hunch that the TransAm's driver may have been [the owner] operating the vehicle with a suspended license was insufficient to establish reasonable suspicion that would have justified stopping the vehicle."

*Id*. at 812. However, the *Bailey* Court concluded that reasonable suspicion to justify the stop was established because the officer also suspected that the TransAm had a faulty exhaust system." *Id*. at 812.

Third, in *Commonwealth v. Farnan*, 55 A.3d 113 (Pa. Super. 2012), a police officer responded to call regarding a custody dispute involving the defendant and his ex-wife. Based on prior incidents with these individuals, the officer was familiar with the defendant's appearance, and that within the prior thirty days the defendant's driving privileges had been suspended. *Id*. While talking to the defendant's ex-wife in front of her residence, the officer observed the defendant driving past. *Id*. at 114-15. The officer then pursued the defendant and initiated a vehicle stop. *Id*. The *Farnan* Court held that the officer had reasonable suspicion to initiate the stop because he was familiar with the defendant's appearance, he saw the defendant driving, he suspected the defendant's license was still suspended, and he needed to investigate the ex-wife's complaint. *Id*.

Read together, *Andersen*, *Hilliar*, *Bailey*, and *Farnan* demonstrate that an officer's knowledge that a vehicle is owned by an individual whose driving privileges are suspended, coupled with only an assumption that the owner is driving the vehicle, does not amount to reasonable suspicion to justify an investigatory detention. Instead, officers must articulate some additional evidence supporting their belief that the person driving has a suspended license or that a problem exists with the vehicle to justify the stop.

- 11 -

Although these cases differ in that they primarily involved a suspected violation of the Vehicle Code, (*i.e.*, suspended driving privileges) rather than suspicion of other criminal activity (*i.e.*, an arrest warrant), as is the case here, this difference is irrelevant. For either one of these stops, the requisite level of suspicion is the same: reasonable suspicion. *See Feczko*, 10 A.3d at 1288 (holding that "an investigative stop of a moving vehicle . . . must be based upon objective facts creating a reasonable suspicion that the detained motorist is presently involved in criminal activity"). While we recognize that an active arrest warrant presents a serious matter, the nature of the criminal activity in question does not alter the applicable constitutional standard. *See Commonwealth v. Rodriguez*, 614 A.2d 1378, 1383 (holding that "[t]he seriousness of the criminal activity under investigation" can never be used as justification for applying a level of suspicion less than that required by the Constitution).

Turning to the suppression record in this case, Officer Taylor conceded that she and Officer Detting had not previously encountered the registered owner of the vehicle as reported by NCIC, they were not familiar with his name, and they had no information regarding the registered owner's age or appearance. N.T. Suppression, 12/7/17, at 14. The officers also did not observe any violation of the Vehicle Code. *Id*. Moreover, at the time the officers stopped Jefferson, they had not confirmed the validity of the warrant for the registered owner of the vehicle. *Id*. Thus, even viewing the suppression record in the light most favorable to the Commonwealth, it is clear

that Officer Taylor and Officer Detting acted solely upon their assumptions that the arrest warrant was valid and that driver of the vehicle was the registered owner for whom the warrant had been issued. These assumptions were insufficient to permit the officers to formulate a reasonable suspicion that the driver of the vehicle was the owner for whom a warrant had been issued. *See Bailey*, 947 A.2d at 812 (clarifying "that a mere assumption is not synonymous with reasonable suspicion").

For these reasons we conclude that the investigatory detention was not supported by reasonable suspicion and was therefore illegal. Consequently, we vacate Jefferson's judgment of sentence, reverse the order denying suppression, and remand for further proceedings consistent with this memorandum.

Judgment of sentence vacated, suppression order reversed, case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date:  8/02/2019

- 13 -