J-E02001-20

2021 PA Super 116

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                             :          PENNSYLVANIA
                             :
               v.            :
                             :
                             :
TAYLOR JEFFERSON             :
                             :
           Appellant         :  No. 1119 WDA 2018

Appeal from the Judgment of Sentence Entered June 12, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0007306-2017

BEFORE:  BENDER, P.J.E., BOWES, J., SHOGAN, J., LAZARUS, J., OLSON, J.,
DUBOW, J., KUNSELMAN, J., MURRAY, J., and McCAFFERY, J.

OPINION BY BENDER, P.J.E.:                      **FILED: JUNE 7, 2021**

Appellant, Taylor Jefferson, appeals from the judgment of sentence of

42-84 months' incarceration, imposed following his conviction of firearms not

to be carried without a license.[1]  Herein, Appellant challenges the trial court's

decision to deny his motion to suppress the seized firearm under the Fourth

Amendment to the United States Constitution and, alternatively, under Article

I, Section 8 of the Pennsylvania Constitution.  He contends that the police

lacked reasonable suspicion to stop his vehicle based solely on the inference

that the registered owner of the vehicle, who had an outstanding warrant,

would be found in the vehicle.  After careful review, we affirm.

The trial court, in disposing of Appellant's motion to suppress, set forth

the following factual history:

_____

[1] 18 Pa.C.S. § 6106(a)(1).

On April 25, 2017, around 11:00 p.m., Officers Alexandria Taylor and Nathan Detting with the Pittsburgh Bureau of Police were patrolling the Homewood area of Pittsburgh. As part of their routine patrol, the officers ran license plate numbers of various vehicles through their computer system to check for stolen vehicles and any [V]ehicle [C]ode violations.

When the officers ran the license plate of a vehicle that was being driven by [Appellant], the officers learned that there was a "full extradition warrant out of Pennsylvania" for an individual named Taylor Jefferson. The officers also learned that Taylor Jefferson was the registered owner of the vehicle. The [National Crime Information Center ("NCIC")] system that the officers used to run the license plate did not provide the officers with a picture of Mr. Jefferson, and the officers were not otherwise familiar with [him] or his name.

As the officers were attempting to validate the warrant, and before the officers had made any contact with [Appellant's] vehicle, [Appellant] pulled over to the side of the road and lawfully parked the vehicle. Officers Taylor and Detting pulled over behind [Appellant's] vehicle and activated a spotlight. The officers' vehicle did not block [Appellant] from being able to leave the parking space. The officers pulled over behind [his] vehicle in order to identify the driver and to investigate whether he was the registered owner of the vehicle, and thus the person for whom there was an arrest warrant.

Officer Detting and Officer Taylor simultaneously approached the vehicle, with Officer Detting approaching the driver's side and Officer Taylor approaching the passenger side. [Appellant] was about to exit the vehicle, with one foot already on the ground, when the officers approached the car. Officer Detting told [him] to remain in the vehicle and asked for his identification. [Appellant] informed Officer Detting that he had left his ID at home, but he provided his full name to the officer.

As Officer Detting was speaking to [him], Officer Taylor observed [Appellant] "slowly and deliberately reach into his right sweat pants pocket" with his right hand. She was able to notice this movement because the officers had illuminated the inside of the vehicle with a spotlight. Officer Taylor was about to tell [Appellant] to remove his hand from his pocket when she saw him "start to pull his hand out of his pocket." As he pulled his hand

out of his pocket, Officer Taylor saw that [Appellant] had a "good grip" on a firearm. Upon seeing the firearm, Officer Taylor drew her weapon and yelled "gun, gun, gun." Officer Detting drew his weapon, and [Appellant] promptly handed the firearm to Officer Detting. Officer Detting retrieved [Appellant's] weapon and asked [him] to exit the vehicle. [Appellant] was handcuffed, and the officers ultimately determined that [he] did not have a license to carry a concealed firearm. [Appellant] was then taken into custody.

Findings of Fact and Conclusions of Law ("TCO"), 2/8/18, at 1-3 (numbering and formatting omitted).

The Commonwealth subsequently charged Appellant with firearms not to be carried without a license, persons not to possess firearms,[2] and possession of a firearm with an altered manufacturer's number.[3] After Appellant's preliminary hearing, the trial court dismissed the charge of possession of a firearm with an altered manufacturer's number, but held the remaining charges for trial.

Appellant filed a motion to suppress the firearm. Following a hearing, the trial court denied the motion, and the case proceeded to a non-jury trial. The charge of persons not to possess firearms was *nolle prossed*, and the trial court convicted Appellant of firearms not to be carried without a license. On June 12, 2018, the trial court sentenced Appellant to 42-84 months' (3½-7 years') incarceration. Appellant filed a timely post-sentence motion for reconsideration of his sentence, which the trial court denied. He then filed a

_____

[2] 18 Pa.C.S. § 6105(a)(1).

[3] 18 Pa.C.S. § 6110.2(a).

timely notice of appeal, and a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The trial court issued a statement pursuant to Rule 1925(a), indicating its reliance on the Findings of Fact and Conclusions of Law it issued on February 8, 2018.

A panel of this Court issued a memorandum decision on August 2, 2019, reversing the trial court's suppression order and vacating Appellant's judgment of sentence. Subsequently, the Commonwealth filed a timely application for reargument before this Court *en banc*. We granted the Commonwealth's application for reargument on October 4, 2019, and withdrew the panel memorandum. Appellant filed a substituted brief on October 15, 2019, and the Commonwealth filed its substituted brief on November 14, 2019.

While this matter was still pending, the United States Supreme Court issued its decision in ***Kansas v. Glover***, 140 S.Ct. 1183 (2020). In response, Appellant promptly filed an application to file a supplemental brief on April 13, 2020. On May 4, 2020, we granted that application. Appellant filed a supplemental brief on May 18, 2020 ("Appellant's First Supplemental Brief"), and the Commonwealth filed its response on May 26, 2020 ("Commonwealth's First Supplemental Brief"). Appellant requested oral argument, which we granted by order dated August 6, 2020.

Subsequently, on December 22, 2020, our Supreme Court issued its decision in ***Commonwealth v. Alexander***, 243 A.3d 177 (Pa. 2020) (overruling ***Commonwealth v. Gary***, 91 A.3d 102 (Pa. 2014)). Appellant

responded on December 30, 2020, by filing a motion for post-submission communication, which we granted by order dated January 19, 2021. In that order, we instructed the parties to submit briefs addressing the impact of *Alexander* on this case. Appellant filed a responsive Supplemental Brief on February 18, 2021 ("Appellant's Second Supplemental Brief"), and the Commonwealth replied on March 4, 2021 ("Commonwealth's Second Supplemental Brief").

Appellant has consistently presented the following question for our review: "Whether the trial court erred in denying [Appellant]'s motion to suppress evidence because, although the trial court correctly concluded that the police officers subjected [Appellant] to an investigative detention, the police officers did not possess reasonable suspicion to justify that seizure?" Appellant's Substituted Brief at 4; Appellant's First Supplemental Brief at 5; Appellant's Second Supplemental Brief at 5.

Our standard of review is well-settled:

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it

is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010) (cleaned up).

The law recognizes three distinct levels of interaction between police officers and citizens: (1) a mere encounter; (2) an investigative detention, often described as a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1 … (1968); and (3) a custodial detention. *See Commonwealth v. Jones*, 874 A.2d 108, 116 (Pa. Super. 2005).

"A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond," *Commonwealth v. DeHart*, 745 A.2d 633, 636 (Pa. Super. 2000) (internal citations and quotations omitted), and therefore need not be justified by any level of police suspicion. *Commonwealth v. Polo*, … 759 A.2d 372, 375 ([Pa.] 2000).

"In contrast, an 'investigative detention' … carries an official compulsion to stop and respond…. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity." *DeHart*, 745 A.2d at 636.

\*\*\*

Finally, "a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest." [*Id.*] This level of interaction requires that the police have probable cause to believe that the person so detained has committed or is committing a crime.

*Commonwealth v. Mackey*, 177 A.3d 221, 227 (Pa. Super. 2017).

Here, the trial court determined that Appellant was subjected to an investigative detention, requiring that the police have reasonable suspicion to believe that Appellant would be driving the vehicle registered to him when the police ran its license plate and discovered that Appellant had a warrant out for

his arrest.[4] Appellant contends that, absent any more information connecting him to the vehicle at that moment in time, their suspicion was not reasonable under the Fourth Amendment to the Federal Constitution (hereinafter, "Fourth Amendment") and Article I, Section 8 of the Pennsylvania Constitution (hereinafter, "Section 8"), to the extent those provisions are coextensive in these circumstances. Alternatively, if he is not entitled to relief under the Fourth Amendment, Appellant maintains that Section 8 provides greater protection than its federal counterpart.

## Fourth Amendment

We first examine whether Appellant is entitled to relief under Fourth Amendment standards. In determining whether police had reasonable suspicion to initiate an investigative detention, "the fundamental inquiry is an objective one, namely, whether the facts available to police at the moment of the intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate." *Commonwealth v. Gray*, 784 A.2d 137, 142 (Pa. Super. 2001). Reasonable suspicion is dependent on both the quantity and quality of the information police possess prior to detaining an individual. *Alabama v. White*, 496 U.S. 325, 330 (1990); *see also Commonwealth v. Wiley*, 858 A.2d 1191, 1197 (Pa. Super. 2004) (holding that reasonable suspicion is measured by what the police knew prior to conducting a search or seizure). In order to assess the facts available to police, we must consider

---

[4] *See* TCO at 4.

the totality of the circumstances. *Id.* While reasonable suspicion is a less stringent standard than probable cause, the detaining officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks and citation omitted).

> Appellant first argues that,
>
> [a]ccording to Officer Taylor, the Commonwealth's only witness at the suppression hearing, although the driver of the vehicle did not commit any violations of the Motor Vehicle Code, she learned through NCIC that the registered owner of the vehicle was [Appellant], and that [he] may have had an arrest warrant. However, Officer Taylor admitted that, at the precise moment of seizure, she still had not confirmed the validity of the arrest warrant or the identity of the driver. Moreover, Officer Taylor admitted that both she and her partner, Officer Detting, were not familiar in the least with [Appellant], they had no idea what he even looked like, and, indeed, the purpose of the stop was to verify the validity of the warrant and the identity the driver. In other words, the police officers merely assumed, or were acting on an unparticularized hunch, that the driver of the vehicle was [Appellant].

Appellant's Substituted Brief at 16-17.

The Commonwealth contends that this matter has been effectively resolved by the United States Supreme Court's decision in *Glover*.[5] *See* Commonwealth's First Supplemental Brief at 9-13. In that case, police ran the license plate of a pickup truck they observed on routine patrol, and discovered that Glover, the registered owner of the vehicle, had a revoked

---

[5] Appellant does not dispute that *Glover* generally applies retroactively to this case, as *Glover* was decided during his direct appeal. *See* Appellant's First Supplemental Brief at 16.

Kansas driver's license. **See Glover**, 140 S.Ct. at 1187. The police initiated a traffic stop and quickly discovered that Glover was driving the vehicle, which led to his arrest for driving with a revoked license. Glover sought suppression based on the contention, which appears nearly identical to Appellant's argument in this case, that the police did not possess reasonable suspicion to stop his vehicle based only on the inference that the registered owner of a vehicle would be driving it. Glover was initially successful in the trial court, and the Supreme Court of Kansas ultimately affirmed the trial court's suppression order. The Kansas Court held that "the officer lacked an articulable and reasonable suspicion that the unidentified driver did not have a valid driver's license; the officer's assumption was only a hunch and was unsupported by a particularized and objective belief." **State v. Glover**, 422 P.3d 64, 66 (Kan. 2018), *cert. granted*, 139 S.Ct. 1445 (2019), and *rev'd and remanded*, 140 S.Ct. 1183 (2020).

The United States Supreme Court reversed the Kansas Court's decision, holding that "when the officer lacks information negating an inference that the owner is the driver of the vehicle, the stop is reasonable." **Glover**, 140 S.Ct. at 1186. Writing for the Majority, Justice Thomas reasoned that,

> [b]efore initiating the stop, [the police officer] observed an individual operating a … pickup truck with [a] Kansas plate…. He also knew that the registered owner of the truck had a revoked license and that the model of the truck matched the observed vehicle. From these three facts, [the officer] drew the commonsense inference that Glover was likely the driver of the vehicle, which provided more than reasonable suspicion to initiate the stop.

> The fact that the registered owner of a vehicle is not always the driver of the vehicle does not negate the reasonableness of [the officer]'s inference. Such is the case with all reasonable inferences. The reasonable suspicion inquiry "falls considerably short" of 51% accuracy, *see United States v. Arvizu*, 534 U.S. 266, 274 … (2002), for, as we have explained, "[t]o be reasonable is not to be perfect," *Heien v. North Carolina*, 574 U.S. 54, 60 … (2014).

*Id.* at 1188.

Appellant now contends that the Fourth Amendment standard articulated in *Glover* does not apply to the circumstances of this case. In this regard, he first argues that:

> A careful review readily reveals that *Glover* is factually distinguishable from [Appellant]'s case. In *Glover*, the basis of the stop was a revoked driver's license, *[i]d.* at 1187, and Kansas law itself "reinforces that it is reasonable to infer that an individual with a revoked license may continue driving." *Id.* at 1188. In sharp contrast, Pennsylvania law does not presume the identity of a vehicle's driver under any circumstances, including revoked-license situations. As this Honorable Court held in *Commonwealth v. Andersen*, 753 A.2d 1289 (Pa. Super. 2000), "the knowledge a vehicle is owned by an individual whose driving privileges are suspended coupled with the *mere assumption* that the owner is driving the vehicle, does not give rise to articulable and reasonable grounds to suspect that a violation of the Vehicle Code is occurring every time this vehicle is operating during the owner's suspension." [*Id.*] at 1294 (emphasis in original). Moreover, the stop in [Appellant]'s case was not even premised on a revoked driver's license, which was critical to the *Glover* Court's analysis, but, instead, on a potential arrest warrant.

Appellant's First Supplemental Brief at 21.

We disagree with Appellant's attempt to distinguish *Glover* on this basis. As noted by the Commonwealth, the *Glover* Court's discussion of the presumption under Kansas law is not applicable to the facts in this case. *See* Commonwealth's First Supplemental Brief at 12. In *Glover*, the Court

considered whether it was "reasonable to infer that an individual with a revoked license may continue driving." *Glover*, 140 S.Ct. at 1188. The Court suggested that the Kansas law explicitly made the inference reasonable, but also that "common sense suffices to justify this inference." *Id.* Thus, the Court determined that the additional fact known to the police in *Glover*—that Glover's license was revoked—did not make it less likely that he was driving the vehicle registered under his name, at least not to the extent sufficient to undermine the inference that the owner is the driver of a vehicle.

Here, by contrast, the police had no reason to believe Appellant was unlicensed and, therefore, that factor is essentially irrelevant to the reasonableness of their belief that Appellant was driving the vehicle registered to him. *Glover* clearly dictates that the inference that the owner is the driver of a vehicle by itself provides reasonable suspicion to permit a *Terry* stop under the Fourth Amendment, assuming, of course, that the police have reason to believe that the registered owner is involved in criminal conduct. *See id.* at 1186. Consequently, we disagree with Appellant's attempt to distinguish *Glover*.

Moreover, we observe that the suspicion of criminal activity in this case stemmed from a warrant, and was not contingent upon the discovery of Appellant's driving the vehicle. In *Glover*, the police only knew that the registered owner was not legally permitted *to drive*. Here, the only necessary inference was that Appellant would be *found in the vehicle* registered in his

name, not the less-likely assumption that he would be discovered driving it.[6]

Thus, we conclude that the quantum of evidence supporting a finding of reasonable suspicion was at least nominally greater than the facts considered in *Glover*.

Appellant also attempts to distinguish *Glover* by suggesting that the scope of that decision did not extend to the instant case, ostensibly because,

> the police officer in *Glover* confirmed, prior to conducting the stop, that [Glover]'s driver's license had, in fact, been revoked. In [Appellant]'s case, on the other hand, Officer Taylor admitted that, at the precise moment in which [Appellant] was seized, she still had not confirmed the validity of the arrest warrant (or the identity of the driver). In fact, Officer Taylor admitted that the entire purpose of the stop was to verify the validity of the warrant (and the identity the driver).

Appellant's First Supplemental Brief at 22 (citations omitted).

We disagree, and instead adopt the Commonwealth's assessment that "the deputy in *Glover* did not confirm the registered owner's revoked license to any greater degree than Officer Taylor confirmed the arrest warrant [in this case], as both officers merely ran computer checks. *See* [*Glover*,] 140 S.Ct. at 1186." Commonwealth's First Supplemental Brief at 13 n.9. There is no indication in the *Glover* decision that the issue of reasonable suspicion turned on whether the computer check had been 'verified' through some other source. Moreover, certainty about individual factors has never been a prerequisite for reasonable suspicion. "It is well[-]settled that to justify their

_____

[6] It is a simple exercise in logic to conclude that the number of instances in which a particular person is driving a vehicle is a subset of the number of instances in which they are inside that vehicle.

- 12 -

decision to stop and briefly detain [an individual], the police need not establish their suspicions to a level of certainty, a preponderance, or even a fair probability." **Commonwealth v. Epps**, 608 A.2d 1095, 1096 (Pa. Super. 1992).

We are also unpersuaded by Appellant's argument concerning the **Glover** Court's emphasis on "the narrow scope" of its holding. **Glover**, 140 S.Ct. at 1191. In that regard, the Supreme Court remarked that "the presence of additional facts might dispel reasonable suspicion. For example, if an officer knows that the registered owner of the vehicle is in his mid-sixties but observes that the driver is in her mid-twenties, then the totality of the circumstances would not raise a suspicion that the particular individual being stopped is engaged in wrongdoing." **Id.** (cleaned up). Here, there were no additional circumstances known to police tending to dispel the reasonableness of the inference that the owner of a vehicle was likely to be the driver. Consequently, we conclude that **Glover** controls and, therefore, Appellant is not entitled to relief under the Fourth Amendment.[7]

### Section 8

Appellant alternatively contends that, to the extent "that **Glover** is applicable in [his] case, because **Glover** is manifestly inconsistent with the

---

[7] We note that inconsistent prior cases of this Court, such as **Andersen**, have been effectively overruled by **Glover**, insofar as they held that it is not reasonable under the Fourth Amendment for an officer to assume that a registered owner will likely be driving the registered vehicle, unless other facts are known to the officer that tend to undermine that inference.

strong notion of safeguarding individual privacy embodied by … Section 8, the Pennsylvania Constitution should provide an independent basis for relief." Appellant's First Supplemental Brief at 23. Appellant argues that under Section 8, it is not reasonable for an officer to conclude that a driver is the owner of a vehicle for purposes of establishing reasonable suspicion to conduct a *Terry* stop.

The Commonwealth maintains that Appellant waived this issue by presenting it for the first time on appeal. *See* Commonwealth's Supplemental Brief at 14-17; *see also* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). However, it is clear that Appellant invoked Section 8 in his motion to suppress. *See* Suppression Motion, 11/6/17, at 1 ¶ 3 ("[Appellant] requests that this Court suppress the firearm as the fruit of an unlawful seizure under *both* … Section 8 of the Pennsylvania Constitution and the Fourth Amendment….") (emphasis added). Nevertheless, the Commonwealth claims that Appellant did not sufficiently develop that claim in the lower court beyond his nominal invocation of it in the suppression motion.

It is true that "issues, even those of constitutional dimension, are waived if not raised in the trial court[,]" and that a "new and different theory of relief may not be successfully advanced for the first time on appeal." *Commonwealth v. Haughwout*, 837 A.2d 480, 486 (Pa. Super. 2003) (cleaned up). However, given the unique circumstances of this case, the Commonwealth's suggested waiver standard is too harsh.

- 14 -

Appellant invoked Section 8 in his suppression motion, and again in his Rule 1925(b) Statement. His theory of relief remains unaltered—that it is not reasonable for police to believe the owner of a vehicle is driving it for purposes establishing reasonable suspicion to conduct a *Terry* stop where, as here, the owner is the subject of a warrant. While Appellant did not focus on the potential for additional protections under Section 8 beyond that provided by the Fourth Amendment, there was no reason to believe that the Fourth Amendment and Section 8 were not coextensive, as applied to the facts of this case, until *Glover* was decided during appellate review. In his First Supplemental Brief, Appellant now presents substantial analysis of why *Glover* ostensibly departs from long-held standards under Pennsylvania law, an argument that he could not have reasonably made in the lower court before *Glover* was decided.

Furthermore, we find the cases cited by the Commonwealth unpersuasive, given the somewhat unique procedural posture of this case. In *Commonwealth v. Santiago*, 980 A.2d 659 (Pa. Super. 2009),

> Santiago argued on direct appeal that the trial court had erred in failing to suppress the fruits of his statement to police made without the required *Miranda*[8] warnings. [*Id.*] at 664. This Court, relying in part on the U.S. Supreme Court's decision in *United States v. Patane*, 542 U.S. 630 … (2004) (plurality opinion), ruled that the physical evidence obtained subsequent to Santiago's statement was not the fruit of the poisonous tree and that, therefore, the trial court did not err in permitting its admission. [*Santiago*,] 980 A.2d at 665-66. In his appellate brief, Santiago, in an attempt to avoid the dictates of *Patane*, had

---

[8] *Miranda v. Arizona*, 384 U.S. 436 (1966).

> tried to claim that the law set forth therein was inapplicable in Pennsylvania because Article I, Section 9 of the Pennsylvania Constitution affords greater protection than do the provisions in the federal constitution relied upon by the Supreme Court in *Patane*. *Id.* at 666-67 n.6. This Court deemed the claim to be waived, noting that even issues of constitutional dimension can be waived if not raised in the trial court; that new and different theories of relief cannot be advanced for the first time on appeal; and that Santiago had failed to specifically raise his Article I, Section 9 claim prior to the time of direct appeal. *Id.*

Commonwealth's First Supplemental Brief at 17.

However, unlike here, there is no indication in the *Santiago* decision that the appellant had ever invoked Article I, Section 9 in the lower court. Moreover, *Patane* was decided in 2004, whereas Santiago was convicted in 2007 (for conduct that occurred in 2006). Thus, Santiago could have presented the argument that the Pennsylvania Constitution provided greater protection than *Patane* in the trial court, but failed to do so. Here, Appellant could not have made an analogous claim with respect to Section 8 until *Glover* was decided while Appellant was awaiting review in this Court.

The Commonwealth also cites *Commonwealth v. Laney*, 729 A.2d 598 (Pa. Super. 1999), for the proposition that Appellant has waived this claim by only nominally invoking Section 8 in the lower court. However, in *Laney*, the appellant offered "neither caselaw nor reason to hold that [Article 9] offers protection different from the federal constitution[,]" as Laney had only "nominally" invoked such a claim *in his appellate brief*. *Laney*, 729 A.2d at 601 n.1. Here, in Appellant's Supplemental Brief, he has provided substantial analysis and supporting caselaw contending that Section 8 should

provide greater protection than the Fourth Amendment under *Glover*, arguments that were not conceivable before *Glover* was decided. Accordingly, we conclude that application of waiver is neither required nor appropriate in the circumstances of this case. Appellant has adequately preserved this issue for our review.

Turning to the merits of Appellant's claim, the Supreme Court of Pennsylvania "has long emphasized that, in interpreting a provision of the Pennsylvania Constitution, we are not bound by the decisions of the United States Supreme Court which interpret similar (yet distinct) federal constitutional provisions." *Commonwealth v. Edmunds*, 586 A.2d 887, 894 (Pa. 1991). The "federal constitution establishes certain minimum levels which are equally applicable to the analogous state constitutional provision." *Id.* (cleaned up). "However, each state has the power to provide broader standards, and go beyond the minimum floor which is established by the federal Constitution." *Id.* The Supreme Court of Pennsylvania has

> stated with increasing frequency that it is both important and necessary that we undertake an independent analysis of the Pennsylvania Constitution, each time a provision of that fundamental document is implicated. Although we may accord weight to federal decisions where they are found to be logically persuasive and well reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, we are free to reject the conclusions of the United States Supreme Court so long as we remain faithful to the minimum guarantees established by the United States Constitution.

*Id.* at 894–95 (cleaned up).

In **Edmunds**, our Supreme Court established a four-part inquiry for determining whether a provision of the Pennsylvania Constitution provides greater protection than does its federal counterpart. We must consider "1) [the] text of the Pennsylvania constitutional provision; 2) [the] history of the provision, including Pennsylvania case-law; 3) related case-law from other states; [and] 4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." **Id.** at 895.

Text of Section 8

Appellant correctly acknowledges that the texts of Section 8 and the Fourth Amendment are quite similar. Appellant's Supplemental Brief at 26; **see also Edmunds**, 586 A.2d at 895 (recognizing "the wording of the Pennsylvania Constitution is similar in language to the Fourth Amendment of the United States Constitution").[9] Thus, there is nothing in the text of Section

_____

[9] Section 8 provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. Art. I, Section 8.

Similarly, the Fourth Amendment states:

*(Footnote Continued Next Page)*

8 itself that suggests a departure from the Fourth Amendment standard articulated in **Glover**.

Pertinent History of Article 8

Nevertheless, the **Edmunds** Court recognized that the similarity between Section 8 and the Fourth Amendment does not mean we are required "to interpret the two provisions as if they were mirror images," and that we must instead "examine the history of … Section 8, in order to draw meaning from that provision and consider the appropriateness" of departing from Fourth Amendment jurisprudence. **Edmunds**, 586 A.2d at 895–96. In this regard, Appellant maintains that our Supreme Court has consistently held that Section 8 provides greater protection than the Fourth Amendment. As this Court has stated:

> Both the United States Constitution and the Pennsylvania Constitution help shield citizens from improper behavior by the government. The main thrust of protection under the U.S. Constitution is to prevent police misconduct. The Pennsylvania Constitution affords that protection and a heightened protection of an individual's privacy.

**Commonwealth v. Dunnavant**, 63 A.3d 1252, 1257 (Pa. Super. 2013) (citation omitted). Appellant urges that he is entitled to relief under Section

---

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

8 because of its heightened protection for privacy, whereas the Fourth Amendment only countenances the goal of deterring police misconduct for purposes of suppression.

Appellant cites three, pre-**Glover** decisions by this Court in support of his assertion that we should find that Section 8 and the Fourth Amendment are not coextensive in the circumstances of this case. He argues:

> With respect to vehicle stops, this Honorable Court made clear in **Commonwealth v. Andersen**, [753 A.2d 1289 (Pa. Super. 2000)], that knowing the identity of the driver is "patent" to a finding of reasonable suspicion:
>
>> Holding otherwise would subject drivers who lawfully operate vehicles owned or previously operated by a person with a suspended license to unnecessary traffic stops. The example of the family car demonstrates this point. Although a family car may be registered in the name of one individual, numerous additional drivers may be licensed and insured to operate the same vehicle. If we allow the police to stop any vehicle for the mere fact that it is owned or once operated by an individual whose operating privileges are suspended, then each additionally insured driver of the family car could be subject to traffic stops while lawfully operating the family car simply because the license or another operator of the vehicle is suspended. The lack of articulable and reasonable grounds to suspect a violation of the Vehicle Code when such a stop occurs without knowing the identity of the driver is patent.
>
> [**Id.**] at 1294. Similarly, in **Commonwealth v. Bailey**, 947 A.2d 808 (Pa. Super. 2008), this Honorable Court held that "Officer Wall's hunch that the TransAm's driver may have been operating the vehicle with a suspended license was insufficient to establish a reasonable suspicion that would have justified stopping the vehicle." [**Id.**] at 812. And in **Commonwealth v. Hilliar**, 943 A.2d 984 (Pa. Super. 2008), this Honorable Court found the police officer's suspicion that the driver of the vehicle was the owner to be "a reasonable one because the driver matched the description of the owner as a middle aged man[,]" distinguishing **Andersen**

because "there [was] no mention of the police officer making any observation of the physical characteristics of the driver." [*Id.*] at 990 n.1.

Appellant's First Supplemental Brief at 32-33.

While we agree with Appellant's interpretation of these cases insofar as they stand at odds with the inference at issue in *Glover*, they do not support his argument that Section 8 is incompatible with the reasonableness of that inference. Appellant fails to cite any pertinent language or analysis from *Andersen*, *Bailey*, or *Hilliar* demonstrating this Court's reliance on Section 8's heightened privacy protections.

In *Andersen*, after responding to a disturbance at a tavern, the police encountered Anderson while he was sitting in a black Camaro in the parking lot. *See Andersen*, 753 A.2d at 1291. The police learned that the Camaro was registered to Andersen, but that his license was suspended. Andersen was allowed to walk home after the police advised him that he was not permitted to drive. *Id.* at 1292. The following night, the same officers observed the same black Camaro, and initiated a stop. As the *Andersen* Court observed, "the only relevant information possessed by [the officers] prior to the traffic stops was that [Anderson]'s driving privileges were suspended and that the Camaro registered to [him] was being operated. Thus, [the] traffic stop[] w[as] based on the mere assumption that [Anderson] was driving the black Camaro." *Id.* at 1293. Thus, *Andersen* is analogous to the instant case, with the caveat that the inference here is at least nominally stronger. *See* note 6, *supra*.

- 21 -

Andersen specifically raised the question of whether Section 8 provided greater protection than the Fourth Amendment. *Andersen*, 753 A.2d at 1291. However, the *Andersen* Court never reached that specific claim. As it granted relief under the Fourth Amendment, it was unnecessary for the Court to consider whether greater protection existed under the Pennsylvania Constitution. As *Andersen* can only be understood to reflect this Court's interpretation of Fourth Amendment standards, we must conclude that it has been overruled by *Glover*, and provides no support for the notion that Section 8 provides greater protection than the Fourth Amendment in these circumstances.

*Hilliar* involved a similar fact pattern with one notable difference. In that case:

> The police officer ran [Hilliar]'s license plate, and determined that the owner of the vehicle's license was under suspension. The officer also discovered the owner's age and that he was a male. From his observation of the driver[,] the officer believed that [Hilliar] was male, and was about the same age as the owner.

*Hilliar*, 943 A.2d at 987–88. The *Hilliar* Court determined that "the officer formed a reasonable suspicion to conclude that [Hilliar] was driving under suspension…." *Id.* at 992. In doing so, it distinguished Hilliar's reliance on *Andersen*, because police had the opportunity to observe the driver *and* match his description to the vehicle's owner. *Id.* at 990 n.1. However, there is no discussion in *Hilliar* expressing any distinction between Section 8 and the Fourth Amendment.

In **Bailey**, this Court acknowledged that **Andersen** dictated that "a hunch that [a vehicle's] driver may have been operating the vehicle with a suspended license was insufficient to establish a reasonable suspicion that would have justified stopping the vehicle." **Bailey**, 947 A.2d at 812. However, in that case, the police officer stopped Bailey based on that inference, "**and** because he had a reasonable suspicion" that the vehicle "had a faulty exhaust system." **Id.** (emphasis in original). Thus, as had occurred in **Hilliar**, the **Bailey** Court distinguished itself from **Andersen**. Again, there was no discussion of Section 8.

While we agree with Appellant that **Andersen** conflicts with **Glover**, we disagree that the conflict reflects a distinction between Section 8 and the Fourth Amendment, because the **Andersen** rule was neither explicitly nor implicitly premised upon the additional privacy protections provided by Section 8. Rather, we conclude that **Andersen**'s interpretation of the at-issue Fourth Amendment standard has necessarily been overruled by **Glover**.

<u>Related Caselaw from Sister Jurisdictions</u>

Appellant states that he "is unaware of any caselaw from other states interpreting their own constitutions in light of **Glover**." Appellant's First Supplemental Brief at 35. We reach the same conclusion. Although there are now numerous jurisdictions wherein **Glover** has been applied, we cannot find any instance in which a court considered a challenge to **Glover** on state constitutional grounds. Because **Glover** was decided so recently, this may change. At this moment, however, there is no persuasive authority from our

sister jurisdictions that would tend to support an exception to, or departure from, the **Glover** rule pursuant to Section 8.

Policy Considerations

Appellant presents a series of arguments in support of his contention that **Glover** "is inconsistent with important policy considerations relevant to Pennsylvania criminal procedure and … Section 8[,]" which we consider *seriatim*. **Id.** at 40. First, he offers Justice Sotomayor's dissent in **Glover**, in which she generally criticizes the majority decision for its ostensible deviation from Fourth Amendment principles related to the burden of proof at suppression, including the requirement of individualized suspicion. **Id.** at 37-38 (quoting **Glover**, 140 S.Ct. at 1195 (Sotomayor, J., dissenting)). However, Justice Sotomayor's dissent does not purport to speak to policy considerations specific to Pennsylvania and/or Section 8, or even to the potential for greater protection under state constitutions generally. Thus, we do not find it to be persuasive authority with regard to the question before us.

Second, Appellant contends that while both the Fourth Amendment and Section 8 recognize a diminished expectation of privacy in motor vehicles with respect to searches, "there is no diminished expectation of privacy in the **_stop_** of motor vehicles." **Id.** at 38 (emphasis in original). However, there is no dispute here that Appellant was subjected to an investigative detention requiring reasonable suspicion. **Glover** has not altered that standard. Instead, **Glover** delves deeper into the weeds regarding a common inference in police-citizen interactions involving motor vehicles—that there is a

reasonable chance that the person driving a motor vehicle is the person under whose name it is registered. The **Glover** Court deemed that inference reasonable. While any traffic stop initiated by police has privacy implications, even a temporary one to briefly confirm the identity of a driver, it does not follow that any inference sanctioned by the United States Supreme Court as reasonable under the Fourth Amendment necessitates rejection of the same inference under Section 8 in order to vindicate Section 8's greater concern for privacy. As Appellant acknowledges, "there currently is no distinction between the federal and state constitutions regarding the definition of reasonable suspicion…." **Id.** at 36. Yet, virtually any decision by the United States Supreme Court on what constitutes reasonable suspicion in a particular case will implicate some degree of privacy concerns. It does not follow that every such case necessarily gives rise to a distinct standard under Section 8.

Third, Appellant cites **Commonwealth v. Matos**, 672 A.2d 769 (Pa. 1996), wherein our Supreme Court stated:

> [T]here exists clear precedent in Pennsylvania defining the appropriate standards to be used when considering whether an individual has been seized. The long-standing definition of what constitutes a seizure applied by the Courts of this Commonwealth cannot be ignored, particularly when viewed in tandem with this Court's recognition of the privacy rights embodied in Article I, Section 8.

**Id.** at 774.

In **Matos**, the Supreme Court considered the United States Supreme Court's ruling in **California v. Hodari D.**, 499 U.S. 621 (1991), where the defendant failed to comply with an order by police to stop, and then

abandoned contraband during his flight. The **Hodari D.** Court determined that a seizure did not occur for Fourth Amendment purposes until the defendant was tackled by police. **Hodari D.**, 499 U.S. at 629. The **Matos** Court held that there were "ample policy reasons to reject the decision of the United States Supreme Court in **Hodari D.** as being inconsistent with the constitutional protections afforded under Article I, Section 8 of the Pennsylvania Constitution." **Matos**, 672 A.2d at 776.

However, we disagree that **Matos** suggests a similar analysis here. In that case, the Court considered whether a seizure occurred, not whether a particular inference from a common set of facts was sufficient to establish reasonable suspicion. As noted above, there is no dispute in this case as to whether a seizure occurred. It is also uncontested that a showing of reasonable suspicion is the appropriate standard to justify that seizure. The only question here is whether the reasonable suspicion standard was satisfied by a particular set of facts known to police at the time they initiated the temporary detention. Under the Fourth Amendment, the **Glover** Court said those facts are enough.

In conducting its analysis pursuant to **Edmunds**, the **Matos** Court recognized that Pennsylvania jurisprudence had a "long-standing definition of what constitutes a seizure" under Section 8, a definition at odds with the **Hodari D.** decision. **Matos**, 672 A.2d at 774. We ascertain no similar history in Pennsylvania with respect to the **Glover** rule. While **Andersen** and its progeny came to a different conclusion under their analysis of the Fourth

Amendment, they did not do so premised upon Section 8. Additionally, our Supreme Court has never had occasion to address the *Andersen* rule. By contrast, in *Matos*, the Pennsylvania Supreme Court recognized a significant history of its own decisions that ran contrary to the rule announced in *Hodari D.*:

> Through our decisions in *Commonwealth v. Hicks*, 253 A.2d 276 (Pa. 1969), *Commonwealth v. Jeffries*, 311 A.2d 914 (Pa. 1973), *Commonwealth v. Jones*, 378 A.2d 835 (Pa. 1977), and *Commonwealth v. Barnett*, 398 A.2d 1019 (Pa. 1979), this Court, both in coordination with and independent of the federal courts, has set forth the standards to be applied in determining whether an individual is seized….

*Matos*, 672 A.2d at 773 (citations reformatted). There is no similar history of Pennsylvania Supreme Court decisions closely on point in this case.

Furthermore, in *Matos*, the Court recognized a significant split in other jurisdictions with regard to whether state constitutions provided greater protections than the Fourth Amendment standard articulated in *Hodari D. See id.* at 775. As noted above, Appellant concedes he cannot offer, and we cannot otherwise find, any decisions by our sister jurisdictions that have addressed the matter either way.

Finally, in his second supplemental brief, Appellant posits that our Supreme Court's recent decision in *Alexander*, overruling *Gary*, supports his contention that Section 8 provides greater protection *Glover*. We disagree.

In *Gary*, our Supreme Court adopted the federal automobile exception to the warrant requirement, "which allows police officers to search a motor vehicle when there is probable cause to do so and does not require any

exigency beyond the inherent mobility of a motor vehicle." **Gary**, 91 A.3d at 104.  As such, the **Gary** Court determined that Section 8 "affords no greater protection than the Fourth Amendment" with respect to a warrantless search of an automobile "that is supported by probable cause…." **Id.**  Just six years later, in **Alexander**, our Supreme Court reversed **Gary**, holding that Section 8 "affords greater protection to our citizens than the Fourth Amendment," and reaffirming its prior decisions that "the Pennsylvania Constitution requires both a showing of probable cause and exigent circumstances to justify a warrantless search of an automobile." **Alexander**, 243 A.3d at 181.

Appellant argues that **Alexander** has reaffirmed the principle that, while the Fourth Amendment's focus is on effective law enforcement and deterring police misconduct, Section 8 prioritizes privacy over the needs of law enforcement.  Appellant's Second Supplemental Brief at 14-15, 19.  He further argues that **Alexander** reaffirms **Edmunds** in that there is no good faith exception in Pennsylvania, which flows from the first argument—that the good faith exception is consistent with the Fourth Amendment's goal of deterring police misconduct—but it is inconsistent with Section 8's focus on the violation of the privacy rights of the individual.  **Id.** at 19.  Moreover, Appellant avers that **Alexander** stands strongly for the proposition that Section 8 is designed to curtail, not to assist, the investigative power of police, **id.** at 19-20, and that privacy rights do not, therefore, evaporate in a motor vehicle, **id.** at 20.   Appellant then argues, relying in part on **Andersen**, that:

>   **Glover**, a Fourth Amendment case, is manifestly inconsistent with

the strong notion of safeguarding individual privacy embodied by Article 1, Section 8. If that fact was not obvious prior to *Alexander*, it certainly must be obvious now in light of *Alexander*. The Pennsylvania Constitution must provide an independent basis for relief by requiring the police, in order to establish reasonable suspicion, to investigate the identity of the driver before conducting a vehicle stop.

*Id.* at 20-21.

While we do not disagree with Appellant's understanding that Section 8's prioritization of privacy rights over the needs of law enforcement was strongly expressed in *Alexander*, following the brief diversion from that principle in *Gary*, it does not follow that the *Glover* decision is incompatible with Section 8. Indeed, we conclude that *Alexander* neither demands, nor even suggests, that a departure from the *Glover* rule is required under Section 8.

First, *Alexander* is not on point. *Alexander* and, relatedly, *Gary*, involved searches requiring probable cause, and whether the inherent mobility of automobiles satisfied the exigency exception to the warrant requirement. The instant case does not involve a search or a seizure that would require probable cause, as Appellant has consistently conceded. Instead, the question before us concerns the lower standard of reasonable suspicion, and the quantum of evidence sufficient to justify further investigation through a temporary detention pursuant to *Terry*. *Alexander* does not speak to this issue at all.

Second, the *Alexander* Court's *Edmunds* analysis is also distinguishable from the case at hand, particularly with regarding the history

of the automobile exception and its relationship to Section 8. Our Supreme Court held in **Commonwealth v. White**, 669 A.2d 896 (Pa. 1995), that the automobile exception to the warrant requirement did not apply in Pennsylvania due to the heightened privacy protection provided by Section 8, and relied on that decision in deciding **Commonwealth v. Labron**, 669 A.2d 917 (Pa. 1995). **See Alexander**, 243 A.3d at 183. The Court further noted that "a number of our decisions garnering clear majorities cited **Labron** and **White** for the proposition that … Section 8 offered greater protections than the Fourth Amendment." **Id.** at 184. When the Pennsylvania Supreme Court adopted the Fourth Amendment's automobile exception in **Gary**, the "Court did not dispute that [its] cases eventually broke from the federal model, and both the lead opinion and the dissent identified the mid-1990s as the relevant timeframe." **Id.** at 183.

Thus, in **Alexander**, there was a significant history of cases, spanning two decades, demonstrating divergence from the federal automobile exception under Section 8 before the **Gary** decision temporarily reversed that trend. Here, as discussed above, none of the cases at odds with **Glover** cited by Appellant were grounded in Section 8, and none of those cases were decided by our Supreme Court. Accordingly, we conclude that **Alexander** does not compel rejection of **Glover** under Section 8, and there is no significant history of Pennsylvania case law that would suggest that the **Glover** inference is incompatible with Section 8's heightened concern for privacy.

Conclusion

In sum, Appellant has failed to meet his burden under **Edmunds**. A textual comparison between the Fourth Amendment and Section 8 does not provide any guidance on the question before us. While we acknowledge that there exists a significant history of interpreting Section 8 to provide greater privacy protections than the Fourth Amendment, Appellant cannot cite any cases where our Supreme Court distinguished Section 8 from the Fourth Amendment on what constitutes reasonable suspicion generally, much less on the more specific factual inference addressed by **Glover**. Although **Glover** contradicts this Court's decision in **Andersen**, the rule in **Andersen** was never specifically addressed by our Supreme Court and does not appear to have been grounded in Section 8 jurisprudence. Moreover, as of yet, we are unaware of any cases from sister jurisdictions rejecting the **Glover** rule on state constitutional grounds. Finally, it can certainly be said that Pennsylvania has a strong policy favoring privacy rights over the needs of law enforcement under Section 8, as articulated by our Supreme Court in **Edmunds**, **Matos**, and most recently, **Alexander**. However, we are far from convinced that any new Fourth Amendment decision by the United States Supreme Court that affects privacy rights—as such decisions inevitably will do—necessitates greater protections under Section 8 merely because privacy rights are implicated. The Fourth Amendment and Section 8 have thus far remained coextensive as to the quantum of evidence necessary to establish reasonable suspicion, and we see no reason to depart from that history today.

Accordingly, we conclude that the Fourth Amendment standard established in *Glover* is coextensive with Section 8 and, therefore, Appellant is also not entitled to relief under that provision.

Judgment of sentence *affirmed*.

Judges Lazarus, Dubow, Murray and McCaffery join this opinion.

Judge Bowes files a concurring opinion in which Judges Shogan, Olson and Kunselman join.

Judges Shogan, Olson and Kunselman concur in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/07/2021